IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BOBBY C. SMITH,                          }
                                         }
    Plaintiff,                       }
                                         }
                                         }      CIVIL ACTION NO.
v.                                       }
                                         }      CV-01-AR-1525-S
THE EQUITABLE LIFE ASSURANCE             }
COMPANY OF THE UNITED STATES,            }
                                         }
    Defendant.                       }

**ENTERED**

**JUL 1 6 2001**

## MEMORANDUM OPINION

The court has before it a motion to remand filed by plaintiff,
Bobby C. Smith ("Smith"). Defendant, The Equitable Life Assurance
Company of the United States ("Equitable"), removed the case from
the Circuit Court of Jefferson County, Alabama, on June 15, 2001,
claiming jurisdiction in this court on the basis of the alleged
existence of a federal question over which this court would have
original jurisdiction under 28 U.S.C. §1331. Equitable asserts
that the action, which was originally filed in the state court on
November 14, 2000, relates to an employee disability insurance plan
governed by the Employee Retirement Income Security Act, 29 U.S.C.
§1132 *et seq.* ("ERISA"), a fact not discovered by Equitable until
it took Smith's deposition on May 17, 2001, and learned that
premiums on the subject disability insurance policy had been paid
in whole or in part by Smith's employer, Gilchrist Pharmacy.

At the time Smith filed suit on November 14, 2000, he was, and
he still is, a resident citizen of Alabama. Equitable is



incorporated in and has its principal place of business in a state other than Alabama.  Smith's suit papers were served on Equitable on November 30, 2000.  The complaint not only demanded benefits allegedly due under the policy of insurance written by Equitable, but sought unquantified compensatory damages for mental anguish and an unquantified amount of punitive damages under Alabama's theory of bad faith refusal to pay, an Alabama tort that applies only to insurance company defendants.  Instead of removing the case within 30 days after November 30, 2000, as seemingly required by a combination of 28 U.S.C. §§ 1441(a) and 1446(b), Equitable filed an answer in the state court on January 2, 2001.  The said answer contains twenty-four separate defenses, the following eighteen of which are carefully crafted responses to Smith's claims for punitive and/or extracontractual damages:

### Sixth Defense

Defendant denies that it has been guilty of any conduct that would support an award of punitive damages.

### Seventh Defense

Any award of punitive damages in this case would be in violation of the constitutional safeguards provided to defendant under the Constitution of Alabama.

### Eighth Defense

Any award of punitive damages cannot exceed the maximum award allowed pursuant to Alabama Code 6-11-21. [*sic*]

### Ninth Defense

Any award of punitive damages in this case would be in violation of the constitutional safeguards provided to

2

defendant under the <u>Constitution of the United States</u>.

## **Tenth Defense**

The punitive damages sought are in excess of comparable maximums established for criminal fines by the Alabama Legislature in §§ 13A-5-11 and 13(A)-5-12, Code of Alabama (1975), jointly and separately.

## **Eleventh Defense**

Each claim for punitive damages, on its face and/or as applied in this case, is in ·violation of the Fifth Amendment of the <u>Constitution of the United States</u>; of the right to counsel provided by the Sixth Amendment of the <u>Constitution of the United States</u>; of the right to trial by jury of the Seventh Amendment of the <u>Constitution of the United States</u>; of the proportionality principles contained in the Eighth Amendment of the <u>Constitution of the United States</u>; the Due Process Clause of the Fourteenth Amendment of the <u>Constitution of the United States</u>; and Article 1, Sections 1, 6, 9, 11, 13, 15, and 35 of the <u>Constitution of Alabama</u>, and is improper under the common law and public policies of the State of Alabama and under applicable court rules and statutes for the following reasons, jointly and separately;

1.   The standards provided by Alabama law for the imposition of punitive damages are insufficiently specific, and therefore, the defendant has not been put on notice and given the opportunity to anticipate punitive liability and/or the potential size of an award and to modify or conform its conduct accordingly;

2.   The procedures to be followed permit an award of punitive damages upon the satisfaction of a burden of persuasion (standard of proof) less than that applicable to the imposition of criminal sanctions for equal culpability;

3.   The procedures to be followed permit the award of multiple punitive damages for the same act or omission;

4.   There are insufficient provisions or standards for clear and consistent appellate review of any award

3

of punitive damages under present Alabama law;

5.   The standards of conduct upon which punitive damages are sought are vague and ambiguous;

6.   The procedures used by Alabama courts and the guidelines given to the jurors, jointly and separately, are vague and ambiguous;

7.   The procedures used by Alabama courts and guidelines given to jurors, jointly and separately, are vague and ambiguous and, thus, impermissibly allow jurors broad, unlimited, and undefined power to make determinations based on their notions of what the law should be instead of what it is;

8.   The procedures under which punitive damages are awarded and instructions used in Alabama courts, jointly and separately, are vague and ambiguous and, thus, fail to eliminate the effects of, and to guard against, impermissible juror passion;

9.   Present Alabama law does not provide for sufficiently objective and specific standards to be used by the jury in its deliberations on whether to award punitive damages and, if so, on the amount to be awarded;

10.  Present Alabama law does not provide a meaningful opportunity for challenging the rational basis for, and any excessiveness of, any award of punitive damages;

11.  Present Alabama law does not provide for adequate and independent review by the trial court and the appellate court of the imposition of punitive damages by a jury or of the amount of any punitive damages awarded by a jury;

12.  The present Alabama procedures fail to provide a constitutional and reasonable limit on the amount of any punitive award against this defendant;

13.  The present Alabama procedures permit the imposition of joint and several judgments against multiple co-defendants of different acts or degrees of wrongdoing or culpability;

4

14.    An award of punitive damages provides compensation
       for elements of damage not otherwise recognized by
       Alabama law.

15.    Present   Alabama   procedures   permit   awards   of
       punitive damages that constitute excessive fines.

16.    An award of punitive damages in this case would
       permit punishment other than by virtue of law
       established and promulgated prior to the alleged
       offense in this case.

17.    The present Alabama procedures fail to require any
       rational, objective or logical relationship between
       either the award of or the amount of punitive
       damages awarded and the alleged conduct of the
       defendant or the compensatory damages awarded to
       the plaintiffs, if any.

### Twelfth Defense

The imposition of punitive damages deprives this
defendant of the right to equal protection under the laws
provided in the Fifth and Fourteenth Amendments of the
Constitution of the United States and in Article 1,
Sections 1 and 6, of the Constitution of Alabama of 1901
for the following reasons, jointly and separately;

1.     Punitive damages are sought in excess of the
       respective maximums established by the Alabama
       Legislative in §§ 13A-5-11 and 13A-5-12, Code of
       Alabama (1975), jointly and separately, whereas
       those charged under the Criminal Code for similar
       or identical culpability have the benefit of the
       cited code provisions;

2.     The procedures to be followed permit the awarding
       of punitive damages upon the satisfaction of a
       burden of persuasion (standard of proof) less than
       the applicable standard in criminal cases for
       criminal sanctions involving similar or identical
       levels of culpability;

3.     The absence of sufficiently specific and objective
       standards for the imposition of punitive damages
       fails to insure the equality of treatment between
       and among similarly situated civil defendants;

5

4.   Punitive damages are penal in nature, and the
     defendant, without procedural protections, is
     compelled to disclose documents and/or other
     evidence without constitutional safeguards against
     self-incrimination whereas persons charged under
     criminal provisions for acts or omissions of
     similar culpability are protected from being
     compelled to disclose documents and/or other
     evidence by constitutional procedures and
     safeguards available in criminal cases.

### Thirteenth Defense

The punitive damages sought are in excess of comparable
maximums established for criminal fines by the Alabama
Legislature in §§ 13A-5-11 and 13A-5-12, Code of Alabama
(1975), jointly and separately.

### Fourteenth Defense

The award of punitive or extra-contractual damages on the
basis of vicarious liability for the conduct of others
violates the Fifth, Eighth and Fourteenth Amendments of
the Constitution of the United States as well as the
Constitution of Alabama provisions set forth above.

### Fifteenth Defense

The assessment and adjudication against this defendant of
any punitive damages other than those measured according
to its sole, individual conduct would be improper and
impermissible.

### Sixteenth Defense

The imposition of punitive damages in this case is
unconstitutional under the due process clause of the
Fourteenth Amendment of the Constitution of the United
States for the following reasons, jointly and severally:

1.   The punitive damages sought in this case are vastly
     disproportionate to the actual damages allegedly
     sustained by the plaintiffs;

2.   The imposition of punitive damages in this case
     constitutes an arbitrary and capricious taking of
     the defendant's property with no rationally stated
     purpose; and

6

3.  Allowing a jury to award punitive damages with
    unfettered discretion is inconsistent with due
    process.

### Seventeenth Defense

The imposition of punitive damages in this case is
unconstitutional under the Fifth and Fourteenth
Amendments of the <u>Constitution of the United States</u> and
Article 1, Sections 5 and 6 of the <u>Constitution of
Alabama</u> because punitive damages are penal in nature, and
the defendant is compelled to disclose documents and/or
other evidence without constitutional safeguards against
self-incrimination.

### Eighteenth Defense

Present Alabama punitive damages procedures allow the
jury to punish defendants for conduct occurring outside
of the state constituting unlawful state regulation of
Interstate Commerce and violation of the Interstate
Commerce Clause of the <u>Constitution of the United States</u>.

### Nineteenth Defense

Plaintiff's claim for punitive damages is barred to the
extent that it seeks the admission into evidence of
defendant's financial worth in determining the amount of
punitive damages to be awarded because punitive damages
are a form of punishment grounded in defendant's status
rather than specific misconduct and, thus, have the
effect of treating classes of citizens unequally in
violation of the equal protection clause of the Fifth and
Fourteenth Amendments of the <u>Constitution of the United
States</u> and Article I, Sections 1, 6, 13 and 22 of the
<u>Constitution of Alabama</u>.

### Twentieth Defense

The imposition of punitive damages in this case is
unconstitutional under the due process clause of the
Fourteenth Amendment of the <u>Constitution of the United
States</u> because the standards for such damages are vague
and ambiguous and are not rationally related to any
legitimate government interest.

### Twenty-first Defense

The imposition of punitive damages in this case is an unconstitutional deprivation of property without the due process of law guaranteed by the Fifth and Fourteenth Amendments of the <u>Constitution of the United States</u> and Article 1, Section 6 of the <u>Constitution of Alabama</u>.

### Twenty-second Defense

Any award of punitive damages to the plaintiff in this case would be in violation of Article 1, Section 10, Clause 1 of the <u>Constitution of the United States</u> and Article 1, Section 22 of the <u>Constitution of Alabama</u> prohibiting laws which impair the obligation of contracts.

### Twenty-third Defense

The imposition of punitive damages in this case violates the double jeopardy clause of the Fifth Amendment of the <u>Constitution of the United States</u> as incorporated into the Fourteenth Amendment of the <u>Constitution of the United States</u>.

### Twenty-fourth Defense

Plaintiff cannot recover for mental anguish, emotional distress, or similar damages, if any, in that there is not fixed, objective and/or clear and consistent standard under Alabama law for ascertaining the amount thereof, such that any award of said damages against defendant would violate the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section VI of the Alabama Constitution, which prohibit deprivation of life, liberty, or property, except by due process.

It affirmatively appears that when Equitable filed its answer on January 2, 2001, it was fully aware that Smith had a realistic expectation of recovering more than $75,000, the jurisdictional amount for a diversity removal.  The mere fact that Equitable may not have then had in its possession the affidavit of Professor George L. Priest now being used by defendants in federal courts in

8

Alabama to accompany diversity removals (a copy of which is attached hereto as an Appendix), does not mean that Equitable was so unsophisticated as to believe that its exposure was less than $75,000. The Alabama tort litigation climate as it existed on November 30, 2000, could not have given it that impression. Cases like this one were at that time being routinely and successfully removed from the Alabama courts to the Northern District of Alabama, to the Middle District of Alabama and to the Southern District of Alabama under 28 U.S.C. §1441(a). If this particular case had been removed by Equitable within 30 days after the complaint was served on it, and the case had been assigned to this judge, this judge would not have questioned the removal for a second, even though the issue of jurisdictional amount may have later been complicated by *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, ___U.S. ___, 121 S. Ct. 1678 (2001), and by *Arnold v. GuideOne Specialty Mutual Insurance Company*, ___ F. Supp. 2d ___, 2001 WL 577873 (N.D. Ala. May 22, 2001). This court seriously doubts that Equitable was clairvoyant or anticipated whatever lids *Leatherman* and *GuideOne* placed on the narrow range of punitive damage cases in which actual damages are confessedly quite small. In the instant case the actual damages include Smith's claim for mental anguish, a claim which historically can translate into an outsize jury award. That was not true in *GuideOne*.

There are two 30 day periods contained in the statutory

removal procedures.  The first is the 30 days referred to above and found at 28 U.S.C. §1446(b).  It requires a defendant to remove within 30 days of the first notice to it of the fact of removability, no matter what the ground for removal.  Equitable did not meet this deadline.  The other 30 day period is found in 28 U.S.C. §1447(c), which requires that a motion to remand be filed within thirty days after the removal if the removal is being challenged "on the basis of any defect other than lack of subject matter jurisdiction".  The defect that this court has described above is a procedural defect.  It can be waived by Smith, and has been waived.  See *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1212 (9th Cir. 1980).

This court deliberately waited 30 days from the removal to see if Smith would take advantage of 28 U.S.C. §1447(c).  Because Smith's motion to remand does not invoke §§ 1446(b) or 1447(c), the court deduces that Smith is supremely confident in his position that this court lacks subject matter jurisdiction and has correctly predicted the outcome in this court.  Another possibility for Smith's relying on a technical defect is that Smith does not want to invite this court to expand or to expound on its theme in *GuideOne*.  The court doubts that Smith's counsel simply did not want to take advantage of a technical shortcoming by opposing counsel.

The only question raised by Smith's motion is whether or not

10

an ERISA preemption appeared suddenly on May 17, 2001, in such a way as to trigger a 30 day removal opportunity based on federal question jurisdiction. Smith's motion directly challenges subject matter jurisdiction. It would, of course, require no motion to remand to call upon this court to examine its subject matter jurisdiction. The 30 day time limitation in §1447(c) is not implicated, because this court is always responsible for examining its own jurisdiction.

The first and least important question prefatory to answering the bigger question of whether ERISA's "super-duper" preemption is here at work, is whether Smith's deposition constitutes an "other paper from which it can first be ascertained that the case is one which is or has become removable", within the meaning of that phrase in §1446(b). Courts are divided on the question of whether the transcript of a deposition is sufficient to satisfy 28 U.S.C. §1446(b). This court has taken the position that a deposition is not such an "other paper". See *Harrell v. Reynolds Metals Co.*, 599 F. Supp. 966 (N.D. Ala. 1985). To like effect is *Mill-Bern Associates, Inc. v. Dallas Semiconductor Corp.*, 69 F. Supp. 2d 240 (D. Mass. 1999). But see *S.W.S. Erectors, Inc. v. Inofax, Inc.*, 72 F.3d 489 (5th Cir. 1996). There has been no expression from the Eleventh Circuit on the subject. Because Smith has not raised the timeliness issue posed by §1446(b), and because the untimeliness of a removal does not implicate subject matter jurisdiction, the court

is relieved of any obligation to rethink what it said in *Harrell*.

Smith strikes at the heart of Equitable's notice of removal by pointing out, without contradiction, that there were no non-owner employees of Gilchrist Pharmacy insured under Equitable's disability policy. The only two named insureds were the owners of the business. How Equitable reached its erroneous conclusion that this was an ERISA plan goes unexplained. This particular policy of insurance covered people who were employed by themselves. The Eleventh Circuit has clearly drawn the line on employer benefits plans, as distinguished from employee benefit plans, insofar as ERISA preemption is concerned. See *Slamen v. Paul Revere Life Ins. Co.*, 166 F. 3d 1102, 1104 (11th Cir. 1992), in which the Eleventh Circuit precisely and pointedly held that in order to be governed by ERISA "the plan must provide benefits to at least one employee, not including an employee who is the owner of the business in question". Because this policy is not part of an ERISA plan and can present no federal question, Smith's counsel's supreme confidence in a lack of subject matter jurisdiction is justified. Smith's motion to remand will be granted by separate order.

DONE this ___16[th]___ day of July, 2001.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| NITA BARKER, ADORIS CLARK, WILLIE GREATHOUSE, WILLIE HEFLIN, BETTY JOHNSON and MONROE WOOD<br><br>Plaintiffs,<br><br>v.<br><br>LIFE INSURANCE COMPANY OF GEORGIA, "A" being the correct designation of the entity which sold the policies referred to in the Complaint by the Plaintiffs; "B" being the correct designation of the entity, which set, charged, and collected the premiums from the policies referred to in the Complaint; the identities of which are unknown at the present time, but will be added by amendment when duly ascertained<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION FILE NO. 01-PT1187-E |

## AFFIDAVIT OF GEORGE L. PRIEST

Before me, the undersigned authority, appeared GEORGE L. PRIEST, who first being duly sworn , deposes and states as follows:

1.    I am more than twenty-one years of age.  I reside in New Haven, Connecticut, and all statements made herein are based on my personal knowledge.

2.    I serve as a professor at Yale Law School, teaching courses in torts, civil procedure, insurance, insurance regulation, antitrust, products liability, and the economic analysis of law,  I have served as a professor at Yale Law School since 1980. I hold a chair as the John M. Olin Professor of Law and Economics at Yale Law School.

APPENDIX

3.      I received a Bachelor of Arts degree from Yale in 1969 and a law degree from the University of Chicago in 1973.

4.      Since 1980, I have served as a consultant to the Rand Corporation's Institute for Civil Justice in Santa Monica, California. With the support of the Rand Corporation, I organized and directed the first major empirical study of civil jury verdicts in the Chicago and San Francisco courts. See Peterson & Priest, The Civil Jury, Trends in Trials and Verdicts, Cook County, Illinois, 1960-1979. Rand Corp., R-2881-ICJ (1982). The many important and influential studies of civil jury verdicts by Rand Corporation scholars over the past decade and a half all derive from this data source.

5.      Since 1982, I have served as the Director of the Program in Civil Liability at Yale Law School. The Program in Civil Liability is a research organization at Yale Law School comprised of faculty members, faculty members from other universities, Yale Law students, and other individuals interested in reform of the civil justice system in the United States. From time to time, the Program sponsors conferences and symposia on issues related to civil justice reform, including participants from the federal and state judiciary and federal and state legislatures. For example, the Program in Civil Liability with support from the National Science Foundation, among others, sponsored the Symposium, Critical Issues in Tort Law Reform:  A Search for Principles, published at 14 J. Legal Studies 459-818 (1985). The Program also sponsored the Symposia, Issues in Civil Procedure:  Advancing the Dialogue published at 69 Boston U. L. Rev. 467 (1989) and Modern Civil Procedure:  Issues in Controversy, published at 54 Law and Contemp. Probs. 1 (1991).

6.      Much of my scholarly work has been directed toward analyzing both theoretically and empirically the relationship between cases settled before trial, cases tried to verdict, and verdicts subsequently appealed.  In 1984, with economist Benjamin Klein, I published an analytical model of the litigation/settlement process that, in the years since, has provided the basic analytical approach accepted by the academy for the evaluation of these relationships.  Priest & Klein, The Selection of Disputes for Litigation, 13 J. Legal Studies 1 (1984).

7.      Based upon the model presented in that article, and upon subsequent extensions of the model, I have conducted many empirical studies of civil claims, trials, verdicts and appeals.  These studies have been published in various professional peer-reviewed journals both in the law and in the economics literature.  See, e.g., Priest, Measuring Legal Change, 3 J. Law, Econ. & Org. 193 (1988); Priest, Private Litigants and the Court Congestion Problem, 69 Boston U. L. Rev. 527 (1989); Priest, The Role of the Civil Jury in a System of Private Litigation, 1990 U. Chi. Leg. Forum 161 (1990).

8.      For many years, I have been interested in the role of both compensatory and punitive damages verdicts in our civil justice system.  I have conducted empirical studies of both the frequency and magnitude of compensatory and punitive damages verdicts.  I first published an empirical study of punitive damages verdicts using the Chicago court data described above in 1982.  Priest, Punitive Damages and Enterprise Liability, 56 So. Cal. L. Rev. 123 (1982).  More recently, I have published an article analyzing insurance issues relating to punitive damages in the Alabama Law Review. Priest, Insurability and Punitive Damages, 40 Alabama L. Rev. 1009 (1989).

9.      In my study of insurance, I have become familiar with a wide range of life insurance products, including burial insurance, and industrial life insurance products. I have testified several times as an economic expert in regulatory hearings, including on the subject of life insurance practices.

10.      I have testified many times before the United States Congress (both the Senate and the House of Representatives) and before many state legislatures on issues relating both to damages and to our civil justice system.  I have been admitted as an economic expert or have presented economic testimony on remedial questions such as the quantum of damages in federal courts in the Northern District of Alabama, Southern District of Alabama, District of Connecticut, Northern District of Oklahoma, Eastern District of Texas, and Court of Federal Claims and in state courts in the following states: Alabama, Alaska, Arizona, California, Connecticut, Florida, Iowa, Massachusetts, Minnesota, New Mexico, Tennessee, and Texas; and also in Ontario, Canada.  Within Alabama, I have been admitted and have presented testimony on damages issues in courts in Barbour, Bullock, Greene, Jefferson, Lowndes and Mobile Counties.  See, Jackson v. American Bankers Ins. Co. of Florida et al., 976 F. Supp. 1450, 1452-53 (S.D. Ala. 1997); Davis v. Franklin Life Ins. Co., 71 F. Supp.2d 1197, 1199 (N.D. Ala. 1999).

11.      In particular, I have testified regarding the amount in controversy in several Alabama cases.  Such testimony has been referenced in several cases.  See, Jackson v. American Bankers Ins. Co. of Florida et al., 976 F. Supp 1450, 1452-53 (S.D. Ala. 1997); Davis v. Franklin Life Ins. Co., 71 F. Supp.2d 1197, 1199 (N.D. Ala. 1999).

12.      A current curriculum vitae appears as Appendix I.

13.     I have been asked to express my opinion as to the amount in controversy in <u>Barker et al. v. Life Ins. Co. of Georgia</u>, Civil Action File No. 01-PT1187-E, wherein Plaintiffs seek compensatory and punitive damages.

14.     The amount in controversy in any given litigation is different from the settlement value of a case or the expected value of a legal claim. To determine what is "in controversy" in any case requires a review of the entire continuum of possible trial outcomes. The single "amount in controversy" in the case--again, different from the settlement value of the case—represents the furthest point on that continuum: the award that a jury might render if it accepts each of the allegations of the plaintiff and rejects each of the allegations and defenses of the defendant. Thus, for the purpose of the evaluation of the amount in controversy here, it is necessary to presume that the Plaintiffs can prove to the jury that the Defendant knowingly engaged in each of the activities alleged in the Complaint. Correspondingly, it is also necessary to presume that the jury will reject all defenses the Defendant may offer. Finally, it is also necessary for this analysis to presume that the Plaintiffs will be able to prove that they suffered the full range of damages delineated in the Complaint and, therefore, recover each of the damages elements that the Complaint alleges:  both economic damages on account of the Defendant's actions; damages equal to the level of mental anguish suffered by the Plaintiffs; and punitive damages based upon the jury's judgment of the intentional, fraudulent, and/or malicious character of the Defendant's actions.

<u>Compensatory Damages</u>

15.     Based on the assumption that Plaintiffs prove all the allegations set forth in the Complaint, the compensatory damages measure in this case will equal the sum of the economic losses suffered by the Plaintiffs along with damages for the emotional distress suffered after learning that the Defendant had for many years charged, and the Plaintiffs had paid, differential life insurance premiums based on race.  The economic losses will be determined by the number of payments on the policies at issue made by the Plaintiffs, the differential magnitude of annual premiums as between white and black policyholders, and perhaps other consequential losses.  None of these amounts can be determined specifically from the Plaintiffs' pleadings alone.

16.     It is instructive in evaluating these elements of compensatory damages to compare this litigation to claims in the recent Alabama Supreme Court decision in <u>Life Insurance Company of Georgia v. Daisey Johnson</u> , 701 So.2d 685 (Ala. 1997), a case that similarly involved claims, as here, that the insurer preyed on African-American policyholders.  In the <u>Daisey Johnson</u> case, a jury found  that an insurer had fraudulently sold Ms. Johnson an insurance policy that provided her coverage that was redundant given that Ms. Johnson qualified for Medicaid.  Ms. Johnson had paid premiums on her policy on a debit basis for three years before learning that the coverage that she had purchased was unneeded.  In addition to a substantial punitive damages verdict (which I ignore for purposes of analysis in this section), the jury awarded Ms. Johnson a compensatory damages verdict of $250,000.

17.     The Alabama Supreme Court affirmed the compensatory damages verdict of $250,000 in favor of Ms Johnson, emphasizing that Ms. Johnson had paid unnecessary premiums over a three-year period and that the premiums comprised a substantial portion of Ms. Johnson's disposable income.

18.     Given that the jury in the <u>Daisey Johnson</u> case awarded a compensatory damages verdict of $250,000 and that the Alabama Supreme Court has affirmed that quantum of compensatory damages, it is my judgment that the amount in controversy in this action with respect to compensatory damages alone, including the mental anguish element of compensatory damages, may well exceed $75,000.

Punitive Damages

19.     In my research and study of damages verdicts in the State of Alabama, I have reviewed trial court verdicts over the entire State of Alabama over the period 1989 through 1996 as well as Alabama Supreme Court decisions spanning that period and through the present. From among those verdicts, I have specifically examined suits against insurance companies and suits against out-of-state insurance companies—such as the Defendant, here.

20.     It is well-known and my research confirms that, in Alabama, in suits against insurance companies claiming contract breach, fraud or other intentional torts, the punitive damages verdict often exceeds the compensatory damages verdict by a very large multiple. The amount in controversy, of course, must include both the compensatory and punitive damages elements of the verdict that one might expect at trial. The punitive damages amount in controversy will be determined by the jury's evaluation

of the reprehensibility and culpability of the defendant's alleged actions, the need to punish the defendant, the wealth of the defendant, and the many other Hammond/Green Oil factors that are presented for the evaluation of punitive liability.

21.     My research of Alabama verdicts over the years 1989 through 1996 demonstrates that the average trial court punitive damages verdict against an out-of-state insurance company was $3,026,050. Over the same period, 1989 through 1996, the average punitive damages verdict affirmed against an out-of-state insurance company by the Alabama Supreme Court was $1,785,070. (This number is corrected for verdicts affirmed by the Alabama Supreme Court prior to the U.S. Supreme Court's decision in BMW of North America, Inc. v. Gore, 116 S. Ct. 1589 (1996) but subjected to later review subsequent to that decision.)

22.     As all are aware, the Supreme Court of Alabama has adopted a somewhat stricter standard for the evaluation of punitive damages verdicts following the BMW v. Gore decision, supra. In decisions since 1996 (including its re-review of verdicts awarded at earlier points), the Alabama Supreme Court has again had the opportunity to review punitive damages verdicts in actions against out-of-state insurance companies. Following BMW v. Gore through January 26, 2001, the average punitive damages verdict affirmed against an out-of-state insurance company by the Alabama Supreme Court equals $874,667.

23.     Some have argued that the Alabama Supreme Court has tightened its standard for review of punitive damages verdicts even further within the past few years. Many of the punitive damages verdicts against out-of-state insurance companies that

averaged $874,667, reported above, date from 1997 and 1998. There have been no verdicts against out-of-state insurance companies appealed to the Alabama Supreme Court within the past year. For purposes of determining the amount in controversy, however, reviewing all of the punitive damages verdicts affirmed by the Alabama Supreme Court within the past year, it is apparent that the large dollar amounts remain in controversy in Alabama. During the calendar year 2000, the Alabama Supreme Court reviewed nineteen separate punitive damages verdicts, affirming or remitting seventeen of them at positive dollar amounts. (Two were reversed entirely on grounds of excessiveness.) For the year 2000, the average punitive damages verdict affirmed by the Alabama Supreme Court from this entire set of nineteen cases (that is, including the two "zero" (i.e., reversed) verdicts in the average) equals $244,188. Notably, several of these verdicts involved claims of discriminatory behavior on grounds of race and dignitary harm as in the allegations against the Defendant here. See, Wal-Mart Stores, Inc. v. Goodman, 2000 Ala. Lexis 548 (Ala. S.Ct., Dec. 22, 2000).

    24.    Based upon my research and study of damages verdicts awarded in Alabama involving allegations of fraud, concealment, and breach of contract against out-of-state insurance companies, it is my opinion that the amount in controversy in this action involving punitive damages alone exceeds $75,000. The full amount in controversy, including both compensatory and punitive damages, exceeds $75,000 a fortiori.

. General Conclusion

25.    For the various reasons stated above, it is my judgment that the amount in

controversy in this action--including both compensatory damages and punitive

damages—unquestionably exceeds $75,000.

Further affiant sayeth not.

_____

George L. Priest

Sworn to and subscribed before me
this the _14_ day of _Jun_____, 2001.

Notary Public,                          **EDMUND J. FUNARO, JR.**
                                        NOTARY PUBLIC
My Commission Expires:  My Commission Expires June 30  2004

-10-